I think there may be a new, I'm not sure, let's have some, we can get you a new one. Hear ye, hear ye, hear ye, the United States Court of Appeals for the 5th Circuit is now open according to law. God save the United States and this honorable court. Thank you Mr. Whitney. Welcome to all the counsel who are here, both of you, who are here this afternoon. This is our only case to be heard. Something on a expedited schedule, National Association for Gun Rights et al. v. Merrick Garland et al. 24-10707. Looks like Mr. Hinshaw Wood gets to go first. So why don't you begin. Thank you your honor. Good afternoon and may it please the court. A weapon is a machine gun if it fires more than one shot by a single function of the trigger. The Supreme Court in Cargill addressed the meaning of this definition as applied to non-mechanical bump stocks. To do that, the court examined in detail the operation of a semi-automatic rifle with a standard trigger. In the case of a semi-automatic, the trigger must be engaged, released, and then re-engaged for every shot fired. That's necessary because of a component of those triggers called the disconnector. After a shot is fired, the disconnector physically prevents the weapon from until the trigger is released. The bump stocks at issue in Cargill did not alter those standard trigger mechanics at all as the Supreme Court emphasized. Those devices simply sped up the process of engaging, releasing, and re-engaging the trigger. In contrast to bump stocks... Mr. Hinshaw Wood, Cargill dealt with non-mechanical bump stocks as a footnote about accepting out or at least not addressing mechanical ones. Would your argument apply to mechanical bump stocks too? We haven't addressed that question here. I mean, obviously, the Supreme Court left that question open, and this court in its en banc decision in Cargill also suggested that, you know, its reasoning didn't apply to non-mechanical bump stocks. What is relevant to your argument about the operation of the bump stock being mechanical or not mechanical? What is as to your argument today? Because, I mean, part of what's going on here, do we function, how much do we focus on the shooter, how much do we focus on the gun and the actions of each? The trigger does move, and both doing the bump stock and the, and what we're dealing with today. But I guess this is intriguing being getting back into this after our en banc so long ago. Just what is it about the fact that the bump stock was non-mechanical that mattered in the analysis to Cargill? Well, I mean, I think it was partially the court just making clear what it was focusing on. I think the crucial distinction for these purposes between a non-mechanical bump stock, the devices the court actually opined on, and the specific devices at issue here, the crucial point is that these devices don't have a disconnector. They don't have that component that forces physically a need to release and then re-engage the trigger for every shot. The whole point of these devices is that you can, you know, that once the trigger is engaged, there's never a point at which it has to be disengaged or released before further shots come out. That seems to be more relevant to whether it's automatic or not, and that was two different determinations in the Cargill opinion, two different parts of the statute. And it seems to me that, I don't know if it would be true, but it does seem to me the argument's easier for you that this was an automatic operation, and the tougher road to hoe is what we're talking about now. I cut you off. Go ahead. That's all right. I mean, the language about the need to release and re-engage the trigger for every shot is the court's language in describing and interpreting single function of the trigger. That's where that language appears in the opinion. That's what the Supreme Court was focused on in that discussion. And in fact, when it gives kind of the general description of the fundamental difference between a semi-automatic rifle and a machine gun, an M16 that has a component called the auto sear, for example, it says, look, with the semi-automatic rifle, you have to engage and release the trigger for every shot that's fired. You cannot mechanically fire a weapon like that unless the trigger is being engaged and released repeatedly. Counsel, are you arguing that the disconnector, the lack of a disconnector, by definition, is where we draw the line? Your Honor, it's obviously going to depend on the mechanics of any particular weapon or device. I by design have nothing mechanically that prevents the weapon from firing repeatedly after the trigger is engaged. And the fact that the trigger is moving at any particular point isn't dispositive. And we know that both from the Supreme Court's discussion in Cargill and from looking at other devices, such as the machine gun at issue in Carter. There, it was a bolt that was pulled back and then released. And the bolt would go back and forth for every shot fired. It would move every shot fired. But I don't take the other side to dispute that that weapon is a machine gun, even though the trigger, the bolt is moving for every shot. So it's obviously going to depend on what the mechanics of the particular device are. Here, the trigger is engaged. And at no point is it ever disengaged or released before subsequent shot comes out. The trigger is engaged once and the weapon fires repeatedly until the person runs out of ammunition. So it's true that the trigger moves for each shot, though, is that not correct? Right. Just like the machine gun in Carter, the trigger moves for every shot. That's true. But we don't think those subsequent movements are separate functions in the same way. They're not separate functions in Carter. It's the intended mechanical operation of the device that's causing the movement. And that's what we're focused on here as the Supreme Court instructed in Cargill. And I think another way to illustrate this point, Your Honors, is, you know, and to illustrate how Cargill was approaching this question. One of the things Cargill points out is that an individual could, thinking about the non-mechanical bump stocks at issue there, that an individual could accomplish the same effect as a non-mechanical bump stock without the bump stock. A skilled shooter could bump fire without the use of the bump stock. The bump stock itself didn't alter any part of the mechanics of the trigger itself. The mechanics of a standard semi-automatic trigger were exactly the same with those devices as, you know, with an unaltered semi-automatic rifle. Supreme Court said, look, if a skilled shooter can achieve exactly the same effect without the device, there's nothing about the statute that changes, about single function that changes when you change the stock on the weapon, the part that definition ought to change. That isn't true here, right? I mean, there's no way a skilled shooter can engage the trigger and never release or disengage from that trigger and accomplish the same effect as what these devices accomplish. And that's why, you know, I think another illustration of the point that this is fundamentally about the mechanics of these devices and how they differ, you know, from a standard semi-automatic trigger in really fundamental ways. I'm happy to answer, you know, further questions about the specifics of that. I do think it's worth emphasizing, you know, that the plaintiff in Cargill himself advanced a very similar argument to what the plaintiff here is advancing and sort of argued, look, every time the trigger moves, that's a separate function. And the Supreme Court didn't, you know, in its opinion, go out and embrace that particular argument. It instead focused, as it did repeatedly, on the specific mechanics of the device in front of it and the need to, you know, for that trigger to be engaged and then released, you know, for every shot fired. And I don't think it can bear enough emphasis that the devices there did not in any way alter the mechanics of the trigger itself, unlike the devices here, which are, as I said, designed, you know, for the entire purpose of ensuring that there's no need to release and re-engage the trigger for every shot and to in that respect, exactly like an M16 or other machine gun, where the trigger is engaged and never released or re-engaged while the trigger fires, while the weapon fires repeatedly. Mr. Henshaw, you haven't mentioned associational standing or final agency action. Did you want to talk about that here, or did you want to just rely on the briefs on those issues? Well, I'm certainly happy to answer any questions the Court has on the scope of relief and the you should reverse the judgment on the merits. But if you're not going to do that, then we certainly think that there's some serious flaws with the relief that was ordered here, but I want to make sure before I turn to that. Mr. Henshaw, could you stop a minute? With Judge Englehart's permission, before we leave this all apart, I do want to talk about the other, particularly on the remedy and how it might be overbroad if we disagree with the rest of you. Uh, as you, both counsel probably paid attention to our role in the MBAC matter, I didn't understand how this worked at the time of MBAC, so whether I understand now is not particularly reliable. But it does seem to me that what I got wrong in Cargill, according to six judges, you're very smart people, is not understanding the role of the trigger. And you're saying that that role is not as significant as I now think it might be, but that's why we're having an oral argument for all three of us to be, see the benefit of your insights. But it does seem to me that what was going on with the bump stock and the need to maintain pressure in a certain way underneath the, underneath the barrel, and it actually takes a little bit of practice perhaps to make all that work, you still have the movement of the trigger, which was very significant to the Supreme Court. And you are, because it seems to me one case not, I don't think, discussed in Cargill, you're trying to get us not to focus on the trigger. Obviously, that's part of the statute, single function of the trigger. And perhaps as Judge Englehart's question earlier indicated, it does seem to me that the hurdle you have to overcome to get this out from beneath Cargill is that trigger is moving every time, you can't, if the trigger was held back constantly by sufficient force, it wouldn't work, is my understanding. If it was tied back, it wouldn't work automatically. So it has to not bump, which sounds like we're getting into something else. It has to hit the finger again or have enough pressure from the finger again to re-engage. And I'm still not understanding why that is so insignificant to you insofar as being what this case turns on. I don't mean to suggest that it's that how the trigger operates is insignificant. I think we're, you know, we are focused on exactly how this particular trigger is operating. I think to your point, what both plaintiff's expert at the preliminary injunction hearing testified and what ATF found when it tested these devices was that ATF in particular could put a tie, a metal cable tie, around the trigger here and, you know, use that to hold the trigger. And as a result of doing that, could fire repeatedly when the weapon was loaded. And obviously the trigger is pushing against that tie repeatedly for each shot fired. There's no dispute about that. But the point is that, you know, there's no point at which the shooter is doing what Cargill described as the central feature of any semi-automatic rifle, which is engaging and then releasing the trigger or disengaging the trigger. There's no point at which that occurs and there's no dispute. I don't think that that's the case. You pointed out that it's possible to make the device malfunction if you use so much force that you override the ability of the device to function. But that isn't itself dispositive, that the fact that the device can be essentially broken or caused to malfunction doesn't change the fact that what you're doing is engaging the trigger. And at no point is there a spot at which the trigger is being disengaged and then re-engaged. There's no point at which the trigger is being released. And that, again, is the essential characteristic the Supreme Court identified in Cargill of any semi-automatic rifle. So, I mean, I want to be clear, we're focused on the mechanics of these devices and I don't want to leave the impression that we haven't paid attention to that. Our point is that these devices, in fact, operate very similarly to an auto-seer, right? The mechanical component that makes a machine gun or common machine guns, machine guns, right? It performs a lot of the same tasks in terms of timing the release of the hammer for each shot and ensuring that the weapon doesn't malfunction and, you know, and does so in response to a single engagement of the trigger just like an auto-seer. All right, counsel. I think, why don't you return to Judge Ingleheart's, I think, two questions, standing and also remedy. I wish you would start with remedy, though, which is where we did disagree with you and find that this statute, in fact, does not cover what we're talking about. What, how would we limit the injunction in a way that, I mean, you're arguing at least for that, but what would you suggest is the appropriate way to limit it? Right. Well, first of all, it's not obvious to me that there'd be a need for an injunction at all where a declaratory judgment, you know, would be appropriate. But insofar as your question is about just limiting the injunction, I think there's a few respects in which it would need to be limited. One is that injunctions generally cannot issue to restrain criminal prosecutions. And again, that's unnecessary in light of a declaratory judgment. This court's precedent, Supreme Court, has been clear that that's not generally available. In addition, we don't believe injunctive relief is appropriate for these, you know, for members of these organizations who aren't at least identified in this case, in large part because these membership organizations aren't actually membership organizations. They haven't shown anything at summary judgment that demonstrates that the members exert any control over these organizations whatsoever in any meaningful way. And don't, you know, as far as I can tell, square with any prior decision of this court or the Supreme Court recognizing the standing of an association on behalf of members. And so, you know, those points together, I think, would limit the injunction to just individuals who are identified at this point or, you know, and who have, you know, come forward with, you know, sufficient evidence to show that they are actually represented in this suit and were members of the organizations at the time the suit were filed. So, I mean, that would, I think, address particularly the injunctive relief as to, you know, broadly speaking, we've also identified two aspects of the district court's judgment that are of particular concern. One is this requirement to return devices, which is concerning. I mean, that requirement is limited to the parties. But as we've explained, we don't know who the members of these organizations are. And so, we don't know exactly to whom that obligation applies. And so, with, you know, how we can comply with an obligation where we haven't been told to whom we have the obligation is not really explained. And in addition, there's the requirement to send these remedial notices to individuals, including non-parties. It's not clear to me why members of these organizations, since they're purportedly parties, would ever need these notices. So, it really only has, that requirement really only has relevance as to non-parties. And of course, other courts may reach different conclusions from the district court here or this court if it resolves the merits against us. Other courts are actively considering that question. There's a court in New York. There's a criminal prosecution in Puerto Rico. There's a forfeiture action in Utah. There are other cases. Is there one case like ours, the second circuit cases, could be heard in a few days? An appeal of the preliminary injunction is being heard in a few days, although the defendants there who appealed the preliminary injunction, the Rare Breed Triggers Company, expressly said in their brief they weren't contesting whether or not it was a machine gun for purposes of the PI appeal. So, I don't know to what extent that issue would be raised on this appeal. But obviously, the case is still pending in district court. So, you know, that case would presumably at some point proceed to final judgment. Are you saying the working premise for what the second circuit is hearing, though we don't know what they'll do, is that this is a machine gun? Yes, that's exactly what the district court in New York, Eastern District of New York, held under the statute. It's a machine gun. And when I say working premise, that's not being raised as an error in front of the second circuit. That's correct. Their opening brief in that case expressly says they aren't asking the second circuit to set that question right now. But obviously, that's still going to be an issue as that case proceeds to final judgment. Well, your time is up. I would ask Judge Ingleheart to restate whatever he would like to hear about standing. Yeah, I just had one additional question to confirm. In the district court, this case was not treated as one of factual dispute. I think the parties, my understanding is that the parties agreed that the facts were undisputed. Is that a correct characterization? The mechanical operation of these devices is not in dispute. I don't think there's any question about any difference between us. I think we ascribe different meanings to those facts, but the actual how the mechanics of the devices work is not disputed. Okay. All right. Thank you, Mr. Henshawood. You have saved a little time for rebuttal. And we'll now hear from the appellees. Thank you. Good afternoon, and may it please the court. My name is Gary Lukowski on behalf of Point of Appellees. This case is about the government's efforts to apply the law that it wishes it has rather than the one that Congress provided. First, it's about the government's efforts to stretch the definition of machine gun beyond what the statute text will bear and beyond what the statutory interpretation in Cargill will bear. Cargill made clear that the function of the trigger is to release the hammer. That happens once for each function of the trigger with an FRT. Cargill also made clear that engaging with the trigger means to actuate the trigger. That happens every time the trigger, as I believe was Judge Southwick noted, bumps up against the trigger finger in a weapon equipped with an FRT. Thus, FRTs do not fire multiple rounds automatically by a single function of the trigger and are not machine guns. Second, this is about the government's refusal to come to terms with the implications of that previous conclusion. The government notes several practical difficulties that they claim with applying the court's order. However, all those difficulties stem from the government's efforts to do what then District Court Judge, now Justice Jackson, in Kikambua claimed was audaciously demanded entitlement to persist in flagrantly unlawful activity. In other words, it all stems from the government's efforts to continue treating FRTs as machine guns when in fact they are not. Finally, the government's efforts to challenge the associational standing of the plaintiffs misses the mark. The National Association for Gun Rights and Texas Gun Rights are traditional member organizations. Their membership structure is defined in their bylaws and in their board resolutions, respectively, and they exist to express the collective views and protect the collective interests of their members. Thus, they have associational standing under the test that has been set forth by this court and by the Supreme Court for years going on now. So, with that said, let's start with kind of the mechanics of how FRTs work. So, as the court noted, so what is an FRT? It's a standard drop-in trigger. For a standard semi-automatic weapon, what it does is it allows people to fire a weapon slightly faster by resetting the trigger a little more forcefully than with a normal trigger. It doesn't change, though, the basic way triggers operate in the way the government described it. In fact, the District Court identified three key facts with how these operate, and those key facts were undisputed. First, the trigger moves forward into its reset state and is depressed for every single round fired. In other words, there is engagement for every single round that leaves that gun. Second, the trigger must reset for every round that's fired. In other words, it comes back to that rest state. And third, if a shooter attempts to hold the trigger back in its rearmost position, the weapon will malfunction. It won't keep firing. It won't work. Each of these facts distinguish the FRT from what's more commonly considered an automatic weapon, such as an M16, and make them much more analogous to the bump stocks in Cargill. To illustrate that, let's look at how kind of M16s operate and how bump stocks operate. So in an M16, you pull the trigger back. It releases the hammer. You hold the trigger back. The auto-seer kind of takes over and bypasses the trigger. The hammer continues to be released, and rounds continue to fire with no further input from the trigger. It's held back. It's out of the game. It's bypassed. That's not how bump stocks operate, though. With a bump stock, you can hold your trigger finger still, and the recoil of the weapon will cause the trigger to bump up against that finger, firing more quickly. For each shot fired there, the trigger resets. Then the trigger releases the hammer for each and every shot in that instance. In other words, the trigger functions. This is what the court looked at in Cargill, and this is what this court looked at in Cargill, and concluded it was not a machine gun because that trigger resets for every shot, is engaged for every shot, and releases the hammer for every shot. That's also how FRTs work. Unlike an M16, the auto-seer, FRTs do not have an auto-seer. The locking bar that they've referred to in this case is not the equivalent of an auto-seer, and it's not because it doesn't take the trigger out of this process. It does not bypass the trigger and does not allow the weapon to continue to fire without the trigger activating. Rather, all it does is make it so that it can fire faster, but it does not take the trigger out of the game. It still functions for each and every shot, and that function is to release the hammer. Now, the government's placed a lot of weight on things like continuous pull. However, that's just shooter input by another name, which was rejected in Cargill. The government's also placed a lot of weight on the need to release and re-engage a trigger. However, the way they're using those terms is inconsistent with the facts of Cargill and the conclusions of Cargill. In a bump stock, you don't consciously take your finger off the trigger, release it, and pull it back in a sort of conscious pull. It releases itself as it's pulled back and comes back and bumps up against the trigger finger. This is very similar to how an FRT-15 operates. It works the same way. The release and re-engagement is the same. It's that sensation of the trigger being depressed and resetting after each and every shot. Counsel, the Cargill opinion says bump stocks were not machine guns for two reasons, and one of them is that the operation was not automatic. How about this? Is this operation automatic? No, Your Honor. Why not? So, in Cargill, where it talks about automatic, it notes that it automatically modifies function of the trigger, and the trigger does not move automatically when a force reset trigger. It still has to engage with the finger each and every time a shot's fired. It's still actuated by the shooter each and every time a shot's fired. To illustrate the difference, we can look at the bolt gun, for example, that the government references in their briefs. In that situation, you know, you pull the bolt- Are you talking about the Sixth Circuit case? I believe so, yes, Camp. All right. Yeah, so you pull the bolt back, you release it, it keeps firing without any sort of further action. In other words, the trigger, yes, it's moving, but it's moving on its own. It doesn't reengage with the shooter at all. That's not the way an FRT-15 works, or a Watt, or any other of these force reset triggers at issue. Each of those reengage with the shooter's trigger finger by bumping up against it again, pulling back, resetting, bumping up against again, pulling back, and releasing the hammer for each and every shot. Well, it does seem to me that's a fair argument. It seems to me this is much closer to automatic than a bump stock is. I mean, basically, what's going on a bump stock is allowing the gun itself to assist in the speed at which the trigger is being pulled by the individual. Here, it's the operation of the gun that is forcing the trigger back without any forward holding, as in a bump stock forward push by the shooter. I mean, we don't need to quibble over whether it's close or not. You say it's not close enough to being automatic. Exactly, Your Honor. It may well be closer than a bump stock, but it's still not close enough. It still doesn't cross that line. Plus, it's only half the game. Exactly. Proceed. Let me ask you, after telling you proceed, let me say don't proceed. Let me ask you about limiting the judgment. Let's say we do agree with you, which the three of us are not yet agreeing with you. Let's say we agree with you that this is not a machine gun. It does seem to me there are implications in the injunction. Let's start with what your opposing counsel said a little while ago that no injunction at all is needed, and then work down from that. When you get to declaratory judgment that gives you what you want in so far as interpretation of law, why is the rest of this needed? The rest of this is needed because the government is continuing to try to enforce this with as much force as it possibly can. In theory, yes, a declaratory judgment, in particular the vacature, should be sufficient. However, it's plainly not because the government has continued to treat it as not sufficient. Now, recognizing the premise of the question is that three of you have not agreed on the merits yet. We only get to remedy if you do. We only get there if you agree with us that an FRT is not a machine gun. Therefore, that's kind of the baseline for this discussion is that an FRT is not a machine gun. That may seem basic, but that's important because that's kind of what's underlying a lot of the government's argument. This isn't a jump ball. This isn't an open question for the next phase of this case. It's a conclusion and a final judgment. This is not a machine gun. Now, what are kind of the implications that derive from that? First, we have the vacature from the district court. So, we have a vacature, which is the appropriate remedy, as this court noted in Braidwood Management and other cases. That's, one, the default remedy for an APA case, and two, it's the appropriate result, whereas here you have this quasi-rule coming out of the government. And so, the appropriate result is this vacature, which by its very nature is universal. So, it should be applying across the country. It should be applying to everybody, irrespective of whether they are a party of this case. That's the way it's supposed to work under Braidwood Management and under the law of the circuit. What you're hearing from the government, though, is a resistance to doing that. In fact, it's an outright refusal to doing that. They're saying they've repeatedly tipped their hand to try to engage in inter-circuit non-acquiescence to try to limit the number of people who are covered by both vacature, by the injunction, by every other kind of form of relief here. So, what we're seeing is an attempt by the government to give the ruling of the court the narrowest possible scope. In the face of that kind of intent, and it's been repeated at every phase of this litigation, and it's been evident in their briefs that they've filed in other cases, including the Second Circuit, Utah, including in administrative proceedings where they're continuing to claim that FRTs are machine guns. In light of that, it's necessary to have the injunction to give our clients, to give the plaintiffs an actual assurance that, yes, they will be protected in this case. So, in a sense, yes, it is a little bit of a bootstrap on top of, it's a little bit on top of declaratory judgment, but it's necessary. So, what if the government's position that it doesn't know the membership, the specific names of members in your organizations? It seems like there, would it help if we put in the injunction, assuming we agree with you on the merits, that the government can't knowingly engage in the prohibited activity? Well, how are they, how are they to refrain from acting when they don't know who is within the scope of the injunctive relief? In light of the vacature in this case, they shouldn't be acting against anybody, right? And the classification of an FRT as a machine gun was vacated. That classification was operating effectively as an APA-style rule. That vacature means they really shouldn't be attempting to impose that interpretation on anybody, and we believe that kind of resolves that tension there. They don't necessarily- Well, I understand that, but I guess I'm focusing on when you said it's sort of a belt in suspenders. If we're going to go so far as to review the injunctive relief, then we have to encounter this. Otherwise, if you said, if you told us that the vacature was all you needed, well, then that would make it a lot easier, certainly. We don't believe that adding and sort of knowing criteria is necessary. However, if that, we certainly believe that's better than eliminating the injunction or kind of paring back that relief. Any further than that? What about the criminal prosecutions? We believe that's absolutely necessary, given the position they've taken in this case, and given they've kind of held that open as a stick to try to compel individuals to surrender their FRTs, and given that they've argued in this case, well, our classifications are different from the statute. Therefore, we are going to continue to apply the statute where it's not explicitly prohibited to do so. Now, we think that's inconsistent with Franciscan Alliance, which basically said, look, our regulation can only exist with the authority under the statute. Therefore, that distinction is not viable, and it was basing that on the Supreme Court's holding an FECV cruise. However, given that they are seeking to draw that distinction, we think it's to have that protection, and the civil protection is great. It's certainly helpful, but ultimately, the stick that's been used here is the threat of criminal prosecution, and the ultimate aim of this is to remove that stick from hanging over the heads of plaintiffs. You have received a lot from the district court, probably, maybe probably so, maybe not. That's what we're reviewing. It does seem to me the boldest action was to enjoin criminal prosecutions, quite rare action by a court. What's the best example of that being done similar to your case? I don't have a specific example offhand, because it's an unusual situation where a court would vacate a rule and sort of provide an interpretation of a statute, and the government would say, we hear you. We understand that. We'd like to go forward with this anyway, and that seems to be what's happening here. More generally, I think the examples would be things like MedImmune, BABIT, and others where the courts make clear that you don't need to wait for a criminal enforcement to take action. What else do you have for us, counsel? Let's talk a little bit, I suppose, about associational standing and kind of just emphasize why these organizations have it. In their opening brief, the government seems to imply that in order to have associational standing, every member must have standing at the time the complaint is filed. That's simply not correct. It would effectively eliminate associational standing as a concept in the law. It would effectively mean that every individual must come forward and be a plaintiff. Next, the government suggests that the organizations here are not sort of real membership organizations. That's also not correct under the prevailing law here. First, it runs contrary to the rulings of several other courts, which have found that TGR and NAGR are both membership organizations and both can have associational standing when protecting the interests of their members. Second, it seeks to apply the wrong test. This court made clear in Students for Fair Admission that where you have a traditional membership organization, that is, where you have one that has membership criteria in its bylaws or in its board resolutions and applies those, you don't then have to go to the NDSHA membership test in Friends of the Earth. And that's what we have here, is we have traditional membership organizations that have criteria that is set forth in their bylaws and in their board resolutions. Now, the next point on this is the government has emphasized that they believe that the injunction and the relief provided here only applies to people who are members of the associations at the time the complaint was filed. We do not believe that's simply not correct. I mean, that's not how, certainly as a matter of Article III standing, or as a matter of Article III, that's not required. There's plenty of instances, for example, in class actions where people who are not a member of the class at the time the complaint was filed are still able to receive protection. And in Franciscan Alliance, this court affirmed a ruling where there is protection provided both to current and future members. So, as a matter of Article III interpretation, that's simply not correct to say that you have to be a member at the time the complaint was filed in order to be part of the relief that was granted. Finally, if you disagree with me on the NDSHA membership test and believe it does apply here, we would note that we believe these organizations also do have those NDSHA. For example, in Friends of the Earth, it looked at three different factors, only one of which was the ability to control the governance of the organization. It also looked at something like financial support, and it also looked at the voluntary association with the organization. In other words, people were choosing to associate with it to help represent their interests. Now, as Meatloaf said, two out of three ain't bad, and we've got two out of three in this particular case. Would you run that allusion by me again? Oh, that's all right. There's an old Meatloaf song, two out of three ain't bad. Okay, thank you. Sorry, I might be dating my musical taste here. It was clear. More generally, if you look at the hunt factors and you look at kind of what Hunt's getting at when it's assessing membership organizations and associational standing, it's really getting at whether this is an organization where the members are using it to express their collective views and protect their collective interests. That's exactly what these two organizations are. These are vehicles for their members to express their collective views on the Second Amendment and to promote their collective interests on the same. With that, I'll kind of just close with Justice Alito's concurrence in Cargill, noting that we understand there are lots of policy reasons the government and the amici in this case may want to ban FRTs. However, that doesn't change the statute. Those are great arguments that they are welcome to present to Congress and ask to change the law. However, as the law is written now, FRT 15s, Watts, and other FRTs do not function automatically by a single function of the trigger. With that, I'm happy to take any other questions. I just want to ask in light of your closing, which was in a way your opening as I recall. After Cargill has Congress, I mean, there are always bills being introduced, but has there been any particular effort to revise or otherwise address this statutorily? I'm not aware of one, but I also haven't looked specifically for a bill on this subject. Well, that's one of the reasons the Supreme Court acts as a prompt to lay out what Congress could do, but I was wondering. Thank you, Mr. Lukowski. We'll now hear from Mr. Hinshelwood in rebuttal. Thank you, Your Honors. Just a few brief points from me. So with respect to the merits here and whether this is a single function or multiple functions, I admit I came away somewhat more confused about why my colleague thinks the court in Cargill was so focused on the need for the trigger to be released and reengaged. As we pointed out, the reason for that is because there's a mechanical reason that the cycle of fire stops with a semi-automatic trigger that isn't present with a trigger like this one or with an M16, with a machine gun. And that's because of the presence, in particular, of a disconnector. You could have some other component that served the same job. But I'm not sure why, frankly, my colleague thinks the court focused on that, particularly given that I didn't hear him resist the idea that in Carter, the weapon there, that weapon is a machine gun, even though the trigger is moving for every shot that's fired. So I'm not clear, frankly, on what the distinction they're drawing is at that point, if they're willing to acknowledge that a weapon like the one in Carter is, in fact, a machine gun. On the scope of the relief, I think my colleague said a few things that I think are worth addressing. One is I didn't hear him say that we have any way of knowing who the members of these organizations are or who, in fact, this injunction applies to. All I heard was, well, the vacanter here should resolve that because we shouldn't be applying the statute to anyone. But again, the only legal force, the only thing with legal force here is the statute itself. Unlike where an agency issues some rule, a legislative rule that creates new rights and obligations, this is just a circumstance where the agency has said, you know, we think this is what the statute covers. And a court may agree with that or disagree with that on de novo review. The court in New York agreed with us reviewing that question de novo. The district court here disagreed with us reviewing that question de novo. But ultimately, the only source of any legal obligation is the statute itself. So there's really nothing here that's being vacated in any sensible way. And it's certainly the case that while the Supreme Court gets to settle statutory questions for the whole country, a single district court's ruling does not settle those statutory questions for the whole country. That's why I think the district court here went beyond its vacanter, quote, unquote, vacanter, to give declaratory and injunctive relief, because it recognized that there's no rule here that's being acted on or vacated. It's only about whether the statute covers these devices. Kelsey, do you have an example that would be against your interest? This is the Justice Department. Department wins when justice wins. I forget what's chiseled on the side, whatever. Have there been cases for injunctions against criminal prosecutions? I am not aware of a case in a non constitutional situation. So we mentioned there's some in sort of First Amendment context, for example, but I'm not aware of any case. And my colleague couldn't identify one in which a district court entered an injunction barring criminal prosecutions on the basis of a mistaken interpretation of a statute. And the only two cases I know that come close, the Deaver case in the D.C. Circuit and the Stolt-Nielsen case in the Third Circuit, those courts reversed injunctions against criminal prosecution. So I don't think there's anything that supports that particular aspect of the injunction here. And I would add, if you agree with us about that, it mostly resolves for now the question of whether this injunction applies to individuals who join after the complaint is filed. Specifically, we were raising that point in connection with the rare breed parties who were only identified as members after the summary judgment and the parties have never asserted those particular parties were members at the time the complaint was filed. And so we, you know, we don't understand the district court's order to reach individuals who were not members at the time the complaint was filed. And it only really applies, that issue only really arises with respect to those parties. So if you agree with us about the scope of, about the criminal prosecution question, then that particular set of arguments is of less salience at this point. All right, Counselor. So your time is up. I think I may have cut you off in asking that. This is our only case of the day. Was there one other thing you were going to cover before I interrupt? The only, the only last thing I'll say is on the associational standing question. I mean, my colleague cited your, this court's SFFA decision. Even there, the court emphasized that it was a membership organization they were dealing with because that organization had submitted its bylaws, actually submitted them to show what they were and how they complied with them. And those individuals elected at least one member of the governing board of the organization. The individual, the organizations here have never submitted their bylaws. They have described them in some declarations in the vaguest possible terms. We don't know anything about the details of how those bylaws work. And they've never claimed that the members elect any aspect of the board of either of these organizations, or in any way can even direct those boards in what they do. They made a suggestion that they haven't really relied upon, frankly, in their briefs here, that, well, the board can propose referenda for the members to vote on. But it's never said they've actually done that, or that the board would be bound by those, or that the members have any ability. And so we don't think that, you know, this is not really something that looks anything like a membership organization as it's been traditionally understood. All right, counsel. Thank you. Before we close, I actually have a question for you, an institutional question. We get a lot of briefs from the civil division. There's not been an assistant attorney general, I think, for years. Is there no assistant attorney general in the last few years at civil? I don't believe we've had a confirmed assistant attorney general in the last few years, no. All right. Well, thank you. Wherever's phone that is, probably mine. If we can all hear it, I apologize for that. That concludes the argument for today. We are adjourned.